Katherine M. Aizpuru (*pro hac vice*)
Allison W. Parr (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
kaizpuru@tzlegal.com
aparr@tzlegal.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL TEMPEST, LADIAMOND HARVEY, SARAH MCGREGOR HORNER, BRIONNA BROUHARD, KERRY MCCARTY, HILLARY BEAM, and CHRISTOPHER LUNDT on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAFEWAY INC.,<br><br>Defendant. | Case No. 3:24-cv-06553-JSC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Judge: Hon. Jaqueline Scott Corley |

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. FACTS .......... 2

A. No plaintiff agreed to Safeway's May 2024 proposed terms and conditions. .......... 2

B. Evidence that an email was successfully delivered does not establish that the email was received or that the recipient clicked on the linked terms. .......... 4

III. LEGAL STANDARD .......... 5

IV. ARGUMENT .......... 6

A. Safeway's one-way email notice did not create an enforceable contract requiring arbitration. .......... 6

1. Safeway has not provided evidence of notice or mutual assent .......... 6

2. Safeway has not shown it had the right to modify its agreements by email. ... 9

3. Safeway has not shown its emails created a contract. .......... 11

a. Safeway has not shown that sending an email, without more, put Plaintiffs on inquiry notice of new terms. .......... 12

b. Safeway has not shown that shopping at Safeway in-person manifested assent to online terms it sent by email. .......... 16

c. Plaintiffs opted out as soon as they had notice of Safeway's emails. 18

B. Safeway's arbitration clause is unenforceable under *McGill v. Citibank*. .......... 18

C. Safeway's arbitration clause is unconscionable. .......... 22

V. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Cases**

*Ajamian v. CantorCO2e, L.P.*,
203 Cal. App. 4th 771 (2012) .......... 21, 24

*Armstrong v. Michaels Stores, Inc.*,
59 F.4th 1011 (9th Cir. 2023) .......... 5

*Asmus v. Pacific Bell*,
23 Cal.4th 1 (Cal. 2000).......... 10

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011).......... 22

*Babaeva v. J. Crew Grp., LLC* ,
2023 WL 7346079 (N.D. Cal. Nov. 6, 2023) .......... 25

*Bankwitz v. Ecolab, Inc.*,
2017 WL 4642284 (N.D. Cal. Oct. 17, 2017).......... 25

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 6, 16, 17

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) .......... 18

*Bright v. Am. Home Shield Corp.*,
2022 WL 1626714 (E.D. Cal. May 23, 2022) .......... 25

*Brooks v. WarnerMedia Direct LLC*,
2024 WL 3330305 (July 8, 2024).......... 12, 16, 17, 18

*Brown v. Madison Reed, Inc.*,
2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) .......... 19

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 12, 16, 17

*Chavarria v. Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013) .......... 22, 23

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024).......... 6

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 10

*Godun v. JustAnswer LLC*, --- F.4th ---,
2025 WL 1160684 (9th Cir. Apr. 15, 2025) .................... 13, 17

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*,
561 U.S. 287 (2010).................... 6

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019).................... 5, 6

*In re BAM Trading Servs. Inc. Sec. Lit.*,
733 F. Supp. 3d 854 (N.D. Cal. 2024) .................... 22, 23

*In re Facebook Biometric Privacy Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) .................... 14

*Jack v. Ring LLC*,
91 Cal. App. 5th 1186 (2023) .................... 19, 20, 21

*Jackson v. Amazon, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .................... 1, 14, 15

*Jiffy Lube Int'l, Inc., Text Spam Lit.*,
847 F. Supp. 2d 1253 (S.D. Cal. Mar. 9, 2012) .................... 23, 24

*Kamath v. Coinbase, Inc.*,
2024 WL 950163 (N.D. Cal. Mar. 5, 2024).................... 10

*Knutson v. Sirius XM Radio, Inc.*,
771 F.3d 559 (9th Cir. 2014) .................... 6, 12

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (2016) .................... 13

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) .................... 19

*McBurnie v. RAC Acceptance East, LLC*,
95 F.4th 1188 (9th Cir. 2024) .................... 18

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) .................... 2, 18, 20, 22

*Morgan v. Sundance*,
596 U.S. 411 (2022).................... 5

*Morris v. Pac. Dental Servs., LLC*,
2023 WL 4826142 (D. Ariz. July 27, 2023).................... 24

*Morrison v. Yippee Ent'mt*,
2024 WL 4647296 (S.D. Cal. Oct. 31, 2024) .................... 13

*Motown Record Corp. v. Brockert*,
160 Cal. App. 3d 123 (1984) .......... 11

*Nguyen v. Barnes v. Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 12

*Nyulassy v. Lockheed Martin Corp.*,
120 Cal.App. 4th 1287 (Cal. Ct. App. 2007) .......... 24

*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*,
55 Cal. 4th 223 (2012) .......... 22

*PMC v. Porthole Yachts, Ltd.*,
65 Cal. App. 4th 882 (1998) .......... 11, 12

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) .......... 24

*Sadlock v. Walt Disney Co.*,
2023 WL 4869245 (N.D. Cal. July 31, 2023) .......... 10, 11, 15

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 13, 14

*Smith v. H.F.D. No. 55, Inc.*,
2016 WL 881134 (E.D. Cal. Mar. 8, 2016)) .......... 6

*Smith v. Steinkamp*,
318 F.3d 775 (7th Cir. 2003) .......... 24

*Stout v. GrubHub, Inc.*,
2021 WL 5758889 (N.D. Cal. Dec. 3, 2021) .......... 19

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) .......... 6, 14

*Strehl v. Guitar Center, Inc.*,
2023 WL 9700041 (C.D. Cal. Nov. 3, 2023) .......... 9, 16

*Towns v. West Creek Fin., Inc.*,
2023 WL 7490007 (E.D. Cal. Nov. 13, 2023) .......... 6, 13, 14, 18

*Vasquez v. Cebridge Telecom CA, LLC*,
569 F. Supp. 3d 1016 (N.D. Cal. 2021) .......... 19

**Statutes**

9 U.S.C. § 2 .......... 5

## I. INTRODUCTION

Safeway seeks to compel Plaintiffs' claims to arbitration because it sent a mass promotional email that contained a link to updated terms of use, which in turn contained an arbitration agreement. But Safeway has not presented evidence that any Plaintiff agreed to the arbitration agreement that Safeway attempted to unilaterally foist on them via mass marketing email. Safeway presents no evidence that during its relationship with Plaintiffs—most of whom have been "Safeway for U" members for over a decade—Safeway had ever given them a reason to expect an email from Safeway containing an update to the terms and conditions of the Safeway for U program, much less an update that would waive their rights to pursue legal claims in federal court. Safeway presents no evidence that any Plaintiff ever accessed the email address to which Safeway's email was sent. Safeway presents no evidence its emails reached the inbox of any Plaintiff without being diverted to junk, spam, or some other inbox for promotional emails like Safeway's. Safeway presents no evidence that any Plaintiff opened the email. Safeway presents no evidence that any Plaintiff read the email or clicked the link. Safeway's only evidence of a binding arbitration agreement is a declaration stating that it sent emails. Thus, Safeway presents no evidence that any Plaintiff ever consented to unilateral modification of their agreements with Safeway. These are simple, black letter issues of contract formation and assent; Safeway has not carried its burden. *See, e.g.*, *Jackson v. Amazon, Inc.*, 65 F.4th 1093, 1098-99 (9th Cir. 2023) (affirming decision declining to enforce arbitration agreement sent by email to plaintiff without evidence of notice and mutual assent).

Safeway's motion should be denied because it has not presented evidence of the existence of *any* agreement with any Plaintiff, much less an agreement with an arbitration clause. Nor has Safeway put into evidence any of the purported agreements that Plaintiffs agreed to with Safeway *when they became members in Safeway's Safeway for U program*, many of whom did so more than a decade ago. Safeway has not shown that it had the right to modify any such putative agreements by email, or otherwise. Safeway has not shown that its email purporting to add an agreement to arbitrate was reasonably conspicuous or individualized so as to make Plaintiffs fairly aware of the change in terms. Safeway has also not shown that any Plaintiffs interacted in such a way with the email to manifest

consent—as it did not require Plaintiffs' acknowledgment or agreement to be bound in any way before purporting to bind them. Indeed, there is no evidence that a single Plaintiff has ever seen the email, opened the email, or clicked on the link to the terms and conditions in the email.

Safeway's motion should also be denied because its arbitration agreement is unenforceable under *McGill v. Citibank*. It unlawfully purports to deny Plaintiffs the right to seek public injunctive relief in any forum—a provision that California courts have found unenforceable. *See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 961-62 (2017). Since this aspect of the arbitration agreement is unenforceable, the entire provision is "null and void" by its own terms.

And, the unconscionability of its arbitration agreement presents a third basis to deny its motion. The arbitration agreement contains unconscionable provisions that is overly broad, requires losing plaintiffs to pay Safeway's expenses, and imposes a convoluted and unfair pre-suit procedure that would require Plaintiffs to give Safeway a free peek at their claims—all in violation of California law.

Accordingly, for these reasons and as discussed below, Plaintiffs respectfully request that the Court deny Safeway's motion and permit their claims to proceed in this forum.

## II. FACTS

### A. No plaintiff agreed to Safeway's May 2024 proposed terms and conditions.

Each Plaintiff signed up for their Safeway for U memberships long before May 2024, when Safeway claims to have sent each Plaintiff an email from "no-reply@offers.safeway.com" purporting to update the terms and conditions of the Safeway for U membership. *See* Tempest Decl. ¶ 2 (2010); Harvey Decl. ¶ 2 (2012); Horner Decl. ¶ 2 (2012); Brouhard Decl. ¶ 2 (2012); McCarty Decl. ¶ 2 (2009); Beam Decl. ¶ 2 (2013); Lundt Decl. ¶ 2 (2021).

While Safeway asserts that a May 2024 email sent from a no-reply marketing account supposedly bound Plaintiffs to arbitration, six Plaintiffs signed up for their membership accounts in person, while shopping at brick-and-mortar Safeway stores, well over a decade ago. *See* Tempest Decl. ¶ 2; Harvey Decl. ¶ 2; Horner Decl. ¶ 2; Brouhard Decl. ¶ 2; McCarty Decl. ¶ 2; Beam Decl. ¶ 2. Plaintiff Lundt opened his Safeway for U account in 2021 and does not recall whether he signed

up in person or online. Lundt Decl. ¶ 2. None recalls what terms and conditions applied when they signed up for their accounts. *See* Tempest Decl. ¶ 3; Harvey Decl. ¶ 3; Horner Decl. ¶ 3; Brouhard Decl. ¶ 3; McCarty Decl. ¶ 3; Beam Decl. ¶ 3; Lundt Decl. ¶ 3.

The first time Plaintiffs learned that Safeway purported to bind them to arbitration with an email blast was on November 12, 2024, when Safeway filed a declaration stating that in May of 2024, it had sent an email containing a link to updated terms and conditions for the Safeway for U program to an email account associated with each Plaintiff's account. There is no evidence that any of the Plaintiffs received, read, or interacted with these emails. No Plaintiff remembers receiving, seeing, opening, or reading Safeway's May 2024 email, or clicking the link, at or around the time Safeway sent the emails.[1] *See* Tempest Decl. ¶ 10; Harvey Decl. ¶ 9; Horner Decl. ¶ 9; Brouhard Decl. ¶ 10; McCarty Decl. ¶ 10; Beam Decl. ¶ 9; Lundt Decl. ¶ 10. Plaintiffs Brouhard, McCarty, and Tempest are unable to locate the May 2024 email from Safeway. *See* Brouhard Decl. ¶ 9; McCarty Decl. ¶ 9; Tempest Decl. ¶ 9. Plaintiff Beam does not even have access to the email account that Safeway sent the email to. *See* Beam Decl. ¶ 8. And Plaintiffs Harvey, Horner, and Lundt searched for the email, at their counsel's direction, and found them unopened. *See* Harvey Decl. ¶¶ 8-9; Horner Decl. ¶¶ 8-9; Lundt Decl. ¶¶ 9-10. None of the Plaintiffs clicked on the link in the May 2024 email to review the updated terms and conditions. *See* Tempest Decl. ¶ 10; Harvey Decl. ¶ 9; Horner Decl. ¶ 9; Brouhard Decl. ¶¶ 9-10; McCarty Decl. ¶ 9-10; Beam Decl. ¶ 9; Lundt Decl. ¶ 10.

Even worse, the mass no-reply marketing email did not require confirmation of acceptance of the updated terms by clicking any link or checking any box. Rather, Safeway argues that Plaintiffs agreed to arbitrate because they continued to shop at Safeway stores *in-person* after Safeway spammed their known email addresses with updated terms that included an arbitration agreement—even though it never made explicitly clear in the email that such continued shopping would constitute acceptance. But while they continued to shop in person at Safeway stores, none of the Plaintiffs were aware of any arbitration provision in Safeway's terms and conditions sent to them by email until after Safeway filed its motion to compel arbitration on November 12, 2024. *See* Tempest Decl. ¶¶ 4-6;

[1] Those that did open the email only did so after learning about it from counsel after Safeway filed its motion to compel arbitration.

Harvey Decl. ¶¶ 4-6; Horner Decl. ¶¶ 4-6; Brouhard Decl. ¶¶ 4-6; McCarty Decl. ¶ 4-6; Beam Decl. ¶ 4-6; Lundt Decl. ¶ 4-6. Having learned that Safeway purported to bind them to an arbitration provision by sending an email they were previously unaware of, each Plaintiff immediately opted out of the arbitration provision. *See* Tempest Decl. ¶ 7; Harvey Decl. ¶ 7; Horner Decl. ¶ 7; Brouhard Decl. ¶ 7; McCarty Decl. ¶ 7; Beam Decl. ¶ 7; Lundt Decl. ¶ 7.

**B. Evidence that an email was successfully delivered does not establish that the email was received or that the recipient clicked on the linked terms.**

The fact that Plaintiffs were unaware that Safeway had sent them an email purporting to bind them to arbitration the next time they shopped in the store is unsurprising given that Safeway used a mass email campaign, which have known limitations. Not only was a mass marketing email totally unexpected for these in-store shoppers, such promotional emails have low open-rates, and even lower click-through rates.

Researchers studying open and click rates for retailers' mass emails found that most emails from brands and retailers go unread by their recipients. For example, the email marketing service GetResponse analyzed its customers' emails and found that in 2024, the average email open rate was 39.64%. *2024 Email Marketing Benchmarks*, GETRESPONSE, https://www.getresponse.com/resources/reports/email-marketing-benchmarks (last visited Apr. 28, 2025). Another email marketing service, Constant Contact, analyzed its customers emails and found that in the retail industry, the average email open rate was 34.47%. *Average industry rates for email as of December 2024*, CONSTANT CONTACT (Jan. 21, 2025), https://knowledgebase.constantcontact.com/email-digital-marketing/articles/KnowledgeBase/5409-average-industry-rates?lang=en_US.

Far fewer consumers actually interact with these emails beyond opening them. In email marketing, a click-through rate calculates the percentage of recipients who clicked on at least one link in an email. *Email marketing benchmarks & business metrics*, SALESFORCE, https://www.salesforce.com/marketing/email/benchmarks/ (last visited Apr. 28, 2025). A successful click-through rate for marketing emails falls in the range of only 2% to 5%. *Id.* While success can vary, GetResponse reported that the average click-through rate for its customers was 3.25% in 2024.

*2024 Email Marketing Benchmarks*, GETRESPONSE, https://www.getresponse.com/resources/reports/email-marketing-benchmarks (last visited Apr. 28, 2025). Constant Contact looked at its customers specifically in the retail industry and found that the average click-through rate was only 0.83%. *Average industry rates for email as of December 2024*, CONSTANT CONTACT (Jan. 21, 2025), https://knowledgebase.constantcontact.com/email-digital-marketing/articles/KnowledgeBase/5409-average-industry-rates?lang=en_US.

Email open rates and click-through rates are standard metrics in the email marketing industry. Verkhovskaya Decl. ¶ 28. Any platform that Safeway is using to send marketing emails to its customers would collect this information. *Id.* ¶¶ 28-32. And Safeway's email contained tracking pixels indicating that Safeway should be able to determine whether the emails it sent to Plaintiffs were actually opened and whether any links in those emails were actually clicked. *Id.* ¶¶ 34-35. Safeway has not offered that information to the Court in the declarations submitted with its motion. It is therefore reasonable to assume that the majority of Safeway's for U members did not open the May 2024 email informing them that the terms and conditions associated with the membership program had been updated, and that even fewer of its members clicked on any link in the email. Indeed, Safeway did not require any kind of acknowledgment of the arbitration agreement it linked in its spam email by clicking on the link or checking any box that it can point to as mutual assent. Shopping at the store without prior knowledge of any spam email containing a link to an arbitration agreement cannot be said to be knowing consent to terms pushed out in a mass spam email.

## III. LEGAL STANDARD

There is no strong federal policy favoring arbitration agreements above all other contracts. *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014 (9th Cir. 2023). Instead, the Federal Arbitration Agreement makes arbitration agreements "as enforceable as other contracts, but not more so." *Morgan v. Sundance*, 596 U.S. 411, 418 (2022). Thus, before referring a dispute to an arbitrator, the court (not the arbitrator) determines whether a valid arbitration agreement even exists. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019); 9 U.S.C. § 2. This is true even where the purported arbitration agreement includes a delegation clause. *Henry Schein, Inc.*, 586 U.S.

at 69. The moving party bears the burden to show the existence of a binding arbitration agreement. *See Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020). The party opposing arbitration receives the benefit of any reasonable doubts, the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact exist may the court compel arbitration. *See Towns v. West Creek Fin., Inc.*, 2023 WL 7490007, at *4 (E.D. Cal. Nov. 13, 2023) (citing *Smith v. H.F.D. No. 55, Inc.*, 2016 WL 881134, at *4 (E.D. Cal. Mar. 8, 2016)).

## IV. ARGUMENT

### A. Safeway's one-way email notice did not create an enforceable contract requiring arbitration.

"[T]he first question in any arbitration dispute must be: what have these parties agreed to?" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). As the party seeking to compel arbitration, Safeway has the burden to prove that these parties agreed to arbitrate their claims. *See Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 297 (2010) ("To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce.").[2] The formation of a contract requires the parties to "manifest their mutual assent to the terms of the agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). But "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Knutson v. Sirius XM Radio, Inc.*,771 F.3d 559, 566 (9th Cir. 2014). "This principle of knowing consent applies with particular force to provisions for arbitration." *Id.* Here, Safeway has not carried its burden to show Plaintiffs agreed to arbitrate anything.

#### 1. Safeway has not provided evidence of notice or mutual assent.

As the moving party, Safeway must supply evidence of notice and mutual assent to the terms of the agreement. *Berman*, 30 F.4th at 855. But Safeway has failed to substantiate even the most basic facts showing Plaintiffs consented to be bound by its arbitration agreement. The Declaration of Greg

[2] Safeway does not dispute that the Court may decide contract formation. Mot. at 9 ("[T]he Court must determine whether the parties have a valid agreement to arbitrate . . . .").

Borup only presents evidence that Safeway spammed the email addresses associated with Plaintiffs' Safeway accounts with a mass no-reply marketing account. But as discussed below, the Borup declaration does not establish the existence of a contract because sending an email, without more, does not create an enforceable agreement. Safeway's failure to supply more than a sent email is fatal.

***First***, Safeway has not put into evidence what, if any, terms Plaintiffs and Safeway agreed to when Plaintiffs opened their Safeway accounts, some of whom did so as far back as 2009. Without any evidence as to the formation, or substance, of those original agreements (or any supplemental or updated agreements), Safeway has not shown that it had the right to unilaterally modify any Plaintiff's prior agreement with Safeway. The Declaration of Kevin Michael states that each Plaintiff opened a Safeway account between 2009 and 2021. Michael Decl. ¶¶ 23-30. Each Plaintiff thus formed some agreement with Safeway in connection with a Safeway for U account. *See* Tempest Decl. ¶ 2-3; Harvey Decl. ¶¶ 2-3; Horner Decl. ¶¶ 2-3; Brouhard Decl. ¶¶ 2-3; McCarty Decl. ¶¶ 2-3; Beam Decl. ¶¶ 2-3; Lundt Decl. ¶¶ 2-3. But Safeway has not produced those agreements or their terms, or any evidence that Plaintiffs' original agreements gave Safeway the right to unilaterally modify their contracts via email and without new consideration. Plaintiffs do not agree that Safeway may unilaterally modify its agreement with them without providing actual notice of the modifications and new consideration.

***Second***, Safeway does not show that the emails reached inboxes that Plaintiffs check, or even have access to. Hillary Beam, who signed up for her Safeway account in 2013, has not checked the email address associated with her Safeway account in approximately a decade, and does not have the password to the account anymore. Beam Decl. ¶ 8. There is no evidence that Safeway ever sought updated email addresses for Plaintiffs or required Plaintiffs to update their email addresses.

***Third***, even if the emails reached email accounts that Plaintiffs use, Safeway has not shown that the emails landed in any Plaintiff's inbox. Several Plaintiffs were unable to locate Safeway's email when searching for it in their email inbox. *See* Brouhard Decl. ¶ 9; McCarty Decl. ¶ 9; Tempest Decl. ¶ 9. The Borup Declaration states that the email was "delivered" to the email addresses associated with Plaintiffs' accounts but does not indicate whether the emails landed in Plaintiffs'

inboxes or whether they were diverted to junk mail, spam, or other unseen folders that mass emails like Safeway's are routinely filtered into. Safeway has provided no evidence that its emails were not diverted to junk mail, spam, or some other promotional inbox.

***Fourth***, Safeway has not offered evidence that any Plaintiff opened or saw the email. Safeway knows whether Plaintiffs opened the email, as Safeway employed industry-standard tools to monitor which marketing emails customers open. Verkhovskaya Decl. ¶¶ 28-32. Indeed, based on a tracking pixel contained within the email, Safeway could have, but chose not to, provide the Court with information concerning the *time* any emails were opened. *Id*. ¶¶ 34-35. The Borup declaration is silent concerning these critical facts. Plaintiffs have all testified that they did not or that they do not recall. *See* Tempest Decl. ¶ 10; Harvey Decl. ¶ 9; Horner Decl. ¶ 9; Brouhard Decl. ¶ 10; McCarty Decl. ¶ 10; Beam Decl. ¶ 9; Lundt Decl. ¶ 10. There is no evidence that any Plaintiff opened the email.

***Fifth***, Safeway has not shown that any Plaintiff clicked the link in the email. Similar to information about email opening, Safeway could have provided the Court with information as to whether each of the Plaintiffs clicked on any of the links in the email. *See* Verkhovskaya Decl. ¶¶ 28-32. Yet the Borup Declaration does not state that any Plaintiff actually clicked through to the new terms that Safeway asserts bind them. Plaintiffs have all testified that they never clicked the link or they do not recall. *See* Tempest Decl. ¶ 10; Harvey Decl. ¶ 9; Horner Decl. ¶ 9; Brouhard Decl. ¶ 10; McCarty Decl. ¶ 10; Beam Decl. ¶ 9; Lundt Decl. ¶ 10.

***Sixth***, there is no evidence that Safeway ever emailed Plaintiffs prior to sending the May 2024 emails. The Borup and Michael Declarations do not say anything about whether Safeway ever emailed the Plaintiffs before unilaterally attempting to modify its contracts with them. There is nothing in the Michael or Borup declarations to suggest that Plaintiffs knew or should have known Safeway might contact them by email to update the terms of the Safeway for U program, which Plaintiffs used to purchase groceries in brick-and-mortar stores. There is no evidence that email was an expected means of communication from Safeway.

***Seventh***, there is no evidence that Plaintiffs knew or understood that shopping in-person in a Safeway store would bind them to changes hidden on the Safeway website. Safeway has not shown

that there was any notice posted in Safeway stores alerting consumers that they should be on the lookout for an email from Safeway, that they needed to check the Safeway website, or that shopping in the store would bind consumers to arbitrate claims. Although several Plaintiffs signed up for their Safeway for U memberships in person, Safeway does not claim that it provided modified terms in person or otherwise alerted in-person shoppers of the consequences of their shopping.

In sum, Safeway has provided only a single piece of evidence in support of its argument that Plaintiffs each agreed to arbitrate: a self-serving declaration stating that it sent an email to addresses related to the accounts Plaintiffs created between 2009 and 2021. Although proving the existence of a contract is Safeway's burden, Safeway has not supplied any other evidence that could show its attempt to modify their earlier agreements was valid or that its unread emails should be binding.

**2. Safeway has not shown it had the right to modify its agreements by email.**

Safeway argues that the arbitration agreement it seeks to foist upon Plaintiffs was included in the emails it sent in 2024. But its analysis skips a crucial step. Safeway's meager evidentiary showing does not answer a threshold question: what did Plaintiffs' original agreements require for a valid modification?

Safeway has not put into the record the terms of its original agreements with the Plaintiffs. *See* Tempest Decl. ¶ 3; Harvey Decl. ¶ 3; Horner Decl. ¶ 3; Brouhard Decl. ¶ 3; McCarty Decl. ¶ 3; Beam Decl. ¶ 3; Lundt Decl. ¶ 3. And it therefore has not shown that its earlier agreements allowed unilateral modifications by email. Proving that Safeway had the right to modify Plaintiffs' agreements in this manner is Safeway's evidentiary burden, not something the Court can or should just assume (or something that Plaintiffs should be required to prove does not exist). *See, e.g.*, *Strehl v. Guitar Center, Inc.*, 2023 WL 9700041, at *6 (C.D. Cal. Nov. 3, 2023) ("It is not Plaintiff's burden to demonstrate that he did not assent to the terms by not clicking . . . . Defendant has the burden to show that, in placing the orders, Plaintiff clicked the second button.").

Further, Safeway's asserted "unqualified right to modify or terminate" a contract by sending an email that links to (rather than attaches or includes) a materially changed agreement effective "immediately" "is not enforceable," even if permitted by a prior agreement, without some limitations,

such as fairness and reasonable notice. *Asmus v. Pacific Bell*, 23 Cal.4th 1, 16 (Cal. 2000) (noting that powers to terminate or modify a contract must be "subject to limitations, such as fairness and reasonable notice"). Safeway's request that the Court assume the "unqualified right to modify or terminate" its contracts conflicts with the requirement that the power to modify a contract be subject to some limitation to ensure fairness and notice.[3] *See* Michael Decl. Ex. B. There is no evidence of any limitation on Safeway's claimed right to modify its agreements.

A simple hypothetical shows why. Posit that Plaintiffs, in June of 2024, unilaterally emailed to a Safeway-affiliated email account a demand stating that claims arising from their Safeway for U memberships could be litigated in a court on a classwide basis, and that continuing to accept money from Plaintiffs at Safeway stores constituted acceptance of this offer. Would such a unilateral modification have been valid? Surely not, absent some express contractual provision allowing Plaintiffs to change the terms of their agreement this way. It would be Plaintiffs' burden, in that case, to show they had the right to make such a change. Yet Safeway here asks the Court to infer without evidence that it had the right to change the terms of Plaintiffs' agreements by unilateral email without countersignature, consideration, or other evidence of mutual assent. Safeway should be required to prove its attempt at modification was valid.

Safeway's cases are not to the contrary. In Safeway's cases, the defendant placed into the record evidence of the parties' prior agreements showing the defendant had the right to modify the agreements by email. *See, e.g.*, *Kamath v. Coinbase, Inc.*, 2024 WL 950163, at *1 (N.D. Cal. Mar. 5, 2024) (noting defendant produced evidence that parties' original agreement gave defendant the right to "amend or modify this agreement by . . . emailing to [the user] the revised Agreement"); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 922 (N.D. Cal. 2024) (unlike here, defendant produced evidence that parties' original agreement "contained a 'continuing use' provision advising users that their continued use of Coursera's platform would constitute binding acceptance of later-

---

[3] This is one reason (others are discussed below) that *Sadlock v. Walt Disney Co.*, 2023 WL 4869245 (N.D. Cal. July 31, 2023) is distinguishable. There, the email advising of a modification to the parties' agreement was sent in September 2022, with changes effective November 3, 2022. *See Sadlock*, 2023 WL 4869245, at *5. That court assumed, but did not find based on evidence, that email alone could modify the parties' agreement. *See id.* at *12.

revised Terms.”).[4] Safeway has not offered similar evidence for the record here.

When a modification or substitution is void for failure to meet the requirements of a valid contract, then the modification or substitution is unenforceable. *PMC v. Porthole Yachts, Ltd.*, 65 Cal. App. 4th 882, 887 (1998) (proposed modification was unenforceable for lack of mutual assent); *Motown Record Corp. v. Brockert*, 160 Cal. App. 3d 123, 133-34 (1984) (where new consideration was required to modify contract, attempt to change terms without new consideration was void). Safeway has not presented evidence that its existing contracts with Plaintiffs allowed a one-way email to form a new contract. Since Safeway has not carried its burden, the motion should be denied.

**3. Safeway has not shown its emails created a contract.**

Even if the Court accepts Safeway’s invitation to infer the right to unilaterally modify existing agreements, its motion should still be denied. Under California law, a valid modification of a contract

---

[4] *See also, e.g.*, Motion to Dismiss, *Babaeva v. J. Crew Group, LLC*, No. 4:23-cv-1695 (N.D. Cal. May 17, 2023), Dkt. 12-1 (declaration attaching the Terms of Use that “accurately reflects how the Terms of Use on the Website appeared at the time” the plaintiff created her account and which stated that using the site constituted agreement and the defendant reserved the right to make changes); Motion to Compel Arbitration, *Sadlock v. Walt Disney Co.*, No. 3:22-cv-9155 (N.D. Cal. Apr. 6, 2023), Dkt. 18-1 (copy of parties’ original agreement, stating “We may amend these terms. Any such amendment will be effective thirty (30) days following either our dispatch of a notice to you or our posting of the amendment on the Disney Services”); Transcript of Hearing at 117:2-119:25, *In re Facebook Biometric Info. Privacy Litig.* (N.D. Cal. Mar. 4, 2016), Dkt. 118 (reflecting that during evidentiary hearing, the defendant moved into evidence “every version of the terms” and supplied evidence that its contracts allowed unilateral modification by email); Motion to Compel Arbitration, *West v. Uber Techs.*, No. 2:18-cv-3001 (C.D. Cal. Feb. 5, 2018), Dkt. 24-4 (parties’ original agreement, which reserved to defendant the right to modify terms effective upon posting); Declaration of Maxwell Watkins, *Webber v. Uber Techs.*, No. 2:18-cv-2941 (C.D. Cal. Feb. 9, 2018), Dkt. 31-1 (declaration attaching parties’ original agreements, which reserved to defendant the right to modify terms effective upon posting); Declaration of Maxwell Watkins, *Burnett v. Uber Techs.*, No. 17-cv-6835 (N.D. Cal. Mar. 1, 2018), Dkt. 34-2 (in case later consolidated into *In re Uber Technologies, Inc.* MDL proceeding, declaration attaching parties’ original agreements, which reserved to defendant the right to modify terms effective upon posting); *Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314 (C.D. Cal. 2024) (Defendant provided evidence that “all prior versions of its terms and conditions contained similar arbitration provisions”).

*Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005 (9th Cir. 2024) and *Oberstein v. Live Nation Entertainment*, 60 F.4th 505 (9th Cir. 2023) are distinguishable because those cases did not modifications to existing contracts, much less unilateral modifications by email without evidence that the parties had ever agreed to allow such changes.

requires mutual assent. *See, e.g.*, *PMC v. Porthole Yachts, Ltd.*, 65 Cal. App. 4th 882, 887 (1998). But sending an email, without more, does not create mutual assent.

**a. Safeway has not shown that sending an email, without more, put Plaintiffs on inquiry notice of new terms.**

First, Safeway has not proven mutual assent because it has not shown that sending an email, without more, put Plaintiffs on inquiry notice of the arbitration agreement.

Whether the emails created valid contracts turns on "whether the [Plaintiffs] ha[d] actual or constructive knowledge" of their terms. *Nguyen v. Barnes v. Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *accord Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 556 (9th Cir. 2014) ("An offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.")). Here, as in *Nguyen*, Safeway has offered no evidence that any Plaintiff had actual notice of the terms of use; it has not even shown that the email landed in any Plaintiff's inbox (rather than junk or spam) or that any Plaintiff opened it. Thus, the validity of the agreement turns on whether Safeway put Plaintiffs on constructive (inquiry) notice of the terms of Safeway's conduct. *Nguyen*, 763 F.3d at 1177; *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025).

As an initial matter, Safeway has not shown that the inquiry notice construct is even available to contracts that are not formed online or that govern in-person conduct. And Safeway has not put into the record any evidence whether Plaintiffs' agreements with Safeway were formed online versus in person in a Safeway store. In fact, several Plaintiffs signed up in person. *See* Tempest Decl. ¶ 2; Harvey Decl. ¶ 2; Horner Decl. ¶ 2; Brouhard Decl. ¶ 2; McCarty Decl. ¶ 2; Beam Decl. ¶ 2. The Complaint in this case involved conduct occurring in person in stores. And Safeway's May 2024 terms purport to govern not just a website, but rewards that users earn from shopping in person.

Courts permit website operators to demonstrate consent based on inquiry notice "[b]ecause it is difficult to demonstrate 'knowing consent' to an agreement formed online." *Brooks v. WarnerMedia Direct LLC*, 2024 WL 3330305, at *10 (July 8, 2024) (citing *Knutson*, 771 F.3d at 566); *accord Chabolla*, 129 F.4th at 1154 (discussing "internet contracts"); *Nguyen*, 763 F.3d at 1175-76 (discussing "contracts formed on the internet"); *Long v. Provide Commerce, Inc.*, 245 Cal. App.

4th 855, 862 (2016) (same). Safeway has not cited a single case where inquiry notice by way of email was sufficient to modify a contract formed in person governing the parties' in-person relationship. Nor have Plaintiffs' counsel identified any such cases. All of Safeway's cases involve online relationships. Where, as here, the parties' relationship exists in person, there is less reason to bind parties to online agreements they might not have seen.

But even if the Court agrees the inquiry notice test is appropriate here, Safeway still has not met its burden. An enforceable contract will be found based on inquiry notice only if the notice is "reasonably conspicuous." *Berman*, 30 F.4th at 856. And the "onus of creating clarity" is on Safeway. *Brooks*, 2024 WL 4647296, at *5 (noting "the California state courts' tendency to shift the onus of creating clarity onto website creators"); *Jackson*, 65 F.4th at 1100 (noting that "the onus must be on website owners to put users on notice"). And in assessing the validity of inquiry notice, courts "consider the context of a transaction" to determine whether the nature of a user's relationship with a seller would make the user more likely to be on the lookout for changes to terms. *Morrison v. Yippee Ent'mt*, 2024 WL 4647296, at *33 (S.D. Cal. Oct. 31, 2024); *see also Godun v. JustAnswer LLC*, --- F.4th ---, 2025 WL 1160684, at *7 (9th Cir. Apr. 15, 2025) (analyzing the context of the transaction as relevant to formation); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021) ("[T]he full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms.").

Here, Safeway has not provided evidence of the context of the parties' transactions—including not only the nature of the contracts Plaintiffs originally formed with Safeway, but also whether it had ever communicated with Plaintiffs before sending the email in May 2024. There is no evidence Plaintiffs would have known to be on the lookout for an email from Safeway. An email that no Plaintiff knew was coming is not "reasonably conspicuous." *See Towns*, 2023 WL 7490007, at *5-6 ("[T]he fact that Koalafi sent Plaintiff an email with the Agreement before she signed it is irrelevant in light of the fact that no one told her that any such email had been sent."). And Safeway has not shown that any Plaintiff had an obligation to check his or her emails to see if his or her grocery store had sent an email changing the terms of its in-store Rewards program. *See Stover v. Experian*

*Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) ("Stover had no obligation to investigate whether Experian issued new terms without providing notice to her that it had done so."); *see also Jackson*, 65 F.4th at 1100-01 (holding that "a general notice of the possibility of future modifications" is insufficient because it is "unreasonable to require" a party to "monitor his contract constantly for any changes")

Safeway states without factual support that it did not "email[] Plaintiffs out of the blue," but if that were true, then Safeway could and should have provided evidence that Safeway gave Plaintiffs some notice they should look out for an email. Instead, Safeway does not even offer evidence that Safeway had ever emailed the Plaintiffs even a single time prior to purporting to change the terms of their "multi-year, ongoing relationship," Mot. at 13, by email in May of 2024—more than a decade after many of the Plaintiffs first signed up. Nor has Safeway shown that its stores gave in-person shoppers notice of its mass email campaign. Safeway has not shown that its single email, which it has not shown any Plaintiff opened or any Plaintiff read, and which gave Plaintiffs no time to read the new terms before binding them (since the changes were effective "immediately") was "reasonably conspicuous." *See Towns*, 2023 WL 7490007, at *6 ("[I]t is unreasonable to assume that Plaintiff would check her email for a copy of an agreement in the middle of a purchase unless she was told to expect it."); *see also Sellers*, 73 Cal. App. 5th at 476 ("[A] consumer that does not expect to be bound by contractual terms is less likely to be looking for them.").

On top of all this, Safeway also has not shown that its emails to consumers were sufficiently individualized to put the Plaintiffs on notice of the new terms. *See Jackson v. Amazon.com, Inc.*, 559 F. Supp. 3d 1132, 1140-41 (S.D. Cal. 2021, *aff'd*, 65 F.4th (9th Cir. 2023) (finding that defendant failed to meet its burden to show mutual assent) (citing *In re Facebook Biometric Privacy Litig.*, 185 F. Supp. 3d 1155, 1162-64 (N.D. Cal. 2016)). In *Jackson*, the court found that a mass email to "the address that [plaintiff] agreed to keep current" was not "individualized notice of the agreement's existence and contents' adequate to demonstrate that Plaintiff assented to the" updated terms. *See Jackson*, 559 F. Supp. 3d at 1140-41. The court distinguished Amazon's mass email from *Facebook Biometric Privacy Litigation*, in which users were presented with "individualized" jewel notifications

notifying them of changes to the terms and conditions. The Ninth Circuit affirmed, explaining that because the defendant had not provided evidence that the plaintiff received the email or otherwise had notice of the proposed changes, Amazon had not carried its burden: "It was Amazon's burden to show assent, not Jackson's to show lack thereof." *Jackson*, 65 F.4th at 1100. Here, like *Jackson*, in the context of the parties' relationship, there is insufficient evidence to show a lone email that Safeway sent out to all consumer email addresses in en masse was sufficiently individualized to put Plaintiffs on notice of the amended agreement's existence and contents.

And, Safeway presents no evidence that any Plaintiff actually read the email or clicked the link to view the terms. This, too, weighs against finding inquiry notice. *See Jackson*, 65 F.4th 1099-1011 (affirming order denying motion to compel arbitration where, among other things, defendant did not provide evidence that plaintiff opened email containing new terms or read the new terms). In short, nothing about this process could be considered "reasonably conspicuous." And Safeway's primary case explains why. In *Sadlock v. Walt Disney Co.*, which Safeway cites, the Court recognized that merely sending an email would not satisfy the inquiry notice test where (as here) the plaintiff presents evidence that they did not receive or see the emails in question:

> [T]he Court can see potential problems with a defendant relying on notice via email (problems aside from whether the email gave reasonably conspicuous notice of the terms of use). For example, was the email in fact received, or was the email shunted into a spam folder? Is there evidence that the plaintiff actually saw the email? On a macro level, what is the data on the likelihood that emails of this kind are actually received and opened by recipients under similar circumstances? . . . Emails present a different scenario tha[n] the situation where upon initial acceptance, the subscriber takes an affirmative step (e.g., clicking an "agree and subscribe" button) acknowledging receipt of notice. *In this case, however, [Plaintiff] has not contended he did not receive or see the emails in question and has made no argument presenting concerns such as those identified above.*

*Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *13 (N.D. Cal. July 31, 2023) (emphasis added). Unlike *Sadlock*, Plaintiffs do contend they did not receive or see the emails in question. *See* Tempest Decl. ¶¶ 9-10; Harvey Decl. ¶ 9; Horner Decl. ¶ 9; Brouhard Decl. ¶¶ 9-10; McCarty Decl. ¶¶ 9-10; Beam Decl. ¶ 9; Lundt Decl. ¶ 10. Safeway offers no evidence to suggest they did, even though it had the capacity to track whether customers opened and interacted with its email. *See supra* Part II.B.

Since Safeway has not proven its emails reasonably put Plaintiffs on notice of changes to its terms and conditions, they could not have assented to be bound by the arbitration agreement. *See Strehl*, 2023 WL 9700041, at *7 ("Because Defendant's website does not reasonably put users on notice of its Purchase Terms, a user could not have unambiguously manifested assent to be bound by the arbitration agreement."). The motion should be denied.

**b. Safeway has not shown that shopping at Safeway in-person manifested assent to online terms it sent by email.**

Second, Safeway has not shown that shopping at Safeway in person manifested assent to online terms it sent Plaintiffs by email. In addition to conspicuous notice of the contract, Safeway must show that each Plaintiff unambiguously manifested their assent to its terms. *Berman*, 30 F.4th at 855. Safeway argues that Plaintiffs, by continuing to shop at Safeway, agreed to its new terms. *See* Mot. at 11. But where, as here, a party seeking to enforce a contract relies on inquiry notice (since Safeway has not and cannot show actual notice), that party must show that the consumer took action that "*unambiguously* manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (emphasis added). And "the conduct of a party is not effective as a manifestation of assent unless he intends to engage in the conduct *and* knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* at 855-56 (emphasis added).

Safeway has not shown that any Plaintiff knew, or had reason to know, that Safeway would infer from their shopping in-person at Safeway stores that they agreed to new contract terms—particularly without evidence of prior emails to Plaintiffs; that Plaintiffs opened the emails; that Plaintiffs read the emails; or that the emails expressly stated that continuing to shop at Safeway was equivalent to manifesting assent. Indeed, even if Plaintiffs had opened and read the email when it was sent, the email did not warn them that continuing to shop at Safeway stores meant they would be bound by arbitration. Safeway does not even contend that the terms themselves say that shopping confirms agreement. The email did not indicate anything about what Plaintiffs had to do or not do to manifest assent. This showing is insufficient to establish unambiguous manifestation of assent. *Id.* at 858 (continued use of website insufficient where notice "did not indicate to the user what action would constitute assent); *Chabolla*, 129 F.4th at 1158; *Brooks*, 2024 WL 3330305, at *11-14 (clicking a link

to view terms, maintaining a subscription, and logging in were all insufficient to establish unambiguous assent to terms).

Here, *Berman* and its progeny (*Chabolla* and *Godun*) control. In *Berman*, the Ninth Circuit found that simply shopping on a website did not "unambiguously manifest" the plaintiffs' assent to be bound by terms and conditions linked on the website. The court acknowledged that the website provided notice of the terms "in proximity to the 'continue' buttons," but found that the notice did not warn users of the legal significance of continuing to shop. *See Berman*, 30 F.4th at 858. Since the notice "did not indicate to the user what action would constitute assent," the Ninth Circuit concluded that continued use of the website could not be so construed. Likewise here: the email nowhere warns recipients that shopping in a store would bind Plaintiffs to a set of terms and conditions. And as in *Berman*, the "notice defect could easily have been remedied by including language" making that clear, but Safeway did not include such language. *See id. See also Godun*, 2025 WL 1160684, at *8 (failure to "explicitly advise users of what action would constitute assent" precluded a finding of unambiguous manifestation of assent); *Chabolla*, 129 F.4th at 1158 (same).

The lack of notice here is worse than in *Berman* because there, the terms and conditions were linked directly from the website that the plaintiffs were browsing. Here, in contrast, there is nothing that explicitly marries the act of going into a brick-and-mortar store to buy groceries with the act of assenting to an online contract hidden behind a hyperlink in an email. Safeway cannot reconcile its lack of notice with the Ninth Circuit's clear instructions in *Berman.* And without notice to Plaintiffs that shopping at a Safeway would bind them to the terms sent by email, Safeway cannot show that shopping manifested such assent. *See id.*

Safeway again relies on *Sadlock* to argue that Plaintiffs' continued shopping at Safeway manifested consent, but again *Sadlock* is distinguishable. *Sadlock* involved an online product. As at least one other court has recognized, *Sadlock* and similar cases "support only the more limited proposition that continued *use of a website* after receiving notice of proposed changes to the website's terms of use . . . constitutes unambiguous acceptance." *Brooks*, 2024 WL 3330305, at *12 (emphasis

added). *Sadlock* does not say anything about shopping in person at stores, particularly where there is no evidence the email was received in an inbox, opened, or read. *See id*.

**c. Plaintiffs opted out as soon as they had notice of Safeway's emails.**

Safeway argues incorrectly that Plaintiffs' opt-outs were ineffective, but Plaintiffs opted out as soon as they reasonably could given they had no notice of the proposed changes to the terms of their agreements with Safeway. *See* Tempest Decl. ¶ 7; Harvey Decl. ¶ 7; Horner Decl. ¶ 7; Brouhard Decl. ¶ 7; McCarty Decl. ¶ 7; Beam Decl. ¶ 7; Lundt Decl. ¶ 7. And in any event, timeliness of opting out is irrelevant where a party lacked notice and mutual assent to terms. *See Towns*, 2023 WL 7490007, at *5 (noting that there was no need to reach arguments about the timeliness of plaintiff's opt-out where defendant failed to prove mutual assent).

**B. Safeway's arbitration clause is unenforceable under *McGill v. Citibank*.**

If the Court determines that Plaintiffs consented to be bound by Defendant's arbitration agreement, it should find that the arbitration agreement is void. Under California's "*McGill* rule," a contractual provision that waives the right to seek public injunctive relief on behalf of the general public in any forum is invalid, including if the provision is found in an arbitration clause. *McBurnie v. RAC Acceptance East, LLC*, 95 F.4th 1188, 1190 (9th Cir. 2024) (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 961-62 (2017)). The Ninth Circuit has now affirmed multiple times that the FAA does not preempt the *McGill* rule. *See McBurnie*, 95 F.4th at 1190 (citing *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 822 (9th Cir. 2019)). When an arbitration clause completely bars public injunctive relief, the question becomes whether the clause can be severed from the rest of the arbitration agreement. *See McBurnie*, 95 F.4th at 1192. If not, then the entire arbitration agreement is unenforceable. *Id*.

Defendant's arbitration agreement here is explicit in waiving public injunctive relief, stating all claims are to solely be resolved on an individual basis, and that the arbitrator will only have the power to award remedies that "are individual to you."

> YOU AND THE COMPANY AGREE THAT ARBITRATION WILL BE SOLELY ON AN INDIVIDUAL BASIS AND NOT AS A CLASS ARBITRATION, CLASS ACTION, OR ANY OTHER KIND OF REPRESENTATIVE PROCEEDING

> Subject to the terms of this Section 5, a Claim not excluded under Section 4 may only be resolved by binding individual arbitration
>
> [T]he arbitrator may only award legal or equitable remedies that are individual to you or the Company to satisfy one of our individual Claims … The parties understand that absent this mandatory provision, they would have the right to sue in court and have a jury trial.
>
> Any such arbitration shall be conducted by the parties in their individual capacities only and not as a class action or other representative action, and the parties waive their right to file a class action or seek relief on a class basis. If any court or arbitrator determines that the class-action waiver set forth in the preceding sentence is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration agreement set forth in these Dispute Resolution Terms shall be deemed null and void in its entirety and the parties shall be deemed to have not agreed to arbitrate Claims.

*See* Michael Decl., Exhibit A, ECF No. 33-3.[5] These types of terms are routinely found to violate the *McGill* rule, thereby making Defendant's arbitration agreement invalid. *See, e.g., Jack v. Ring LLC*, 91 Cal. App. 5th 1186, 1205 (2023) (citing cases) ("*Ring*").[6] Where, as here, the arbitration provision limits the relief "only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim, federal district courts have construed this language to mean public injunctive relief is not available in arbitration." *See id.* (internal quotations and citations omitted).

Like the defendant in *Ring*, Defendant here may argue that the arbitration in this case contains an "all-remedies clause," which would purportedly allow public injunctive relief in arbitration. *See*

---

[5] Defendant's Exhibit A displaying the purported arbitration terms are nearly illegible. Accordingly, Plaintiffs refer the Court to Defendant's website for a more easy reading of the terms: https://www.albertsonscompanies.com/policies-and-disclosures/terms-of-use/default.aspx#dispute-resolution

[6] *See also, e.g., MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1037 (N.D. Cal. 2022) (clause limiting relief to "injunctive relief only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim" violated *Mcgill*); *Brown v. Madison Reed, Inc.*, 2021 WL 3861457, at *7-8 (N.D. Cal. Aug. 30, 2021) (same); *Vasquez v. Cebridge Telecom CA, LLC*, 569 F. Supp. 3d 1016, 1024-25 (N.D. Cal. 2021) (ban on "representative" actions that prohibited parties from seeking "non-individualized relief that would affect other account holders" violated *McGill*); *Stout v. GrubHub, Inc.*, 2021 WL 5758889, at *9 (N.D. Cal. Dec. 3, 2021) (provision stating "to the maximum extent allowed by law … the arbitrator may award relief (including any declaratory or injunctive relief) only in favor of the individual party seeking relief" violated *McGill*).

*id*. 91 Cal. App. 5th at 1207. The arbitration clause here states that the arbitrator shall have the authority to "grant any remedy or relief that would be available in a court under law or in equity." However, the statement is preceded by the phrase, "As limited by … these Dispute Resolution Terms," which as discussed above, limit the arbitrator to "only award legal and equitable remedies *that are individual to you*." "This language, in turn, is both commonly understood by parties to arbitration agreements to preclude public injunctive relief in arbitration, and interpreted by courts to preclude public injunctive relief in arbitration." *Ring*, 91 Cal. App. 5th at 1207 (internal citation omitted). Further, the only time "injunctive" relief is mentioned in the arbitration agreement is in the section titled "Claims Subject to Binding Arbitration; Exceptions," exempting from arbitration putative injunctive claims concerning intellectual property rights. If injunctive relief were meant to be included as a possible remedy for claims subject to arbitration, Defendant would have included the term in the other sections defining the remedies permitted in arbitration. Instead, Defendant's arbitration agreement expressly permits "only award legal and equitable remedies *that are individual to you* ... to satisfy one of our *individual* Claims."

Defendant's arbitration agreement is explicit, pursuant to Section 5 titled "Binding Individual Arbitration," that the entire arbitration provision is void should the Court find that the *McGill* rule has been violated and the Plaintiffs have the right to seek injunctive relief in court. Two sentences after stating that "the arbitrator may only award legal or equitable remedies that are individual to you or the Company to satisfy one of our individual Claims," the agreement states that "The parties understand that absent this mandatory provision, they would have the right to sue in court and have a jury trial." In the last paragraph of Section 5, the agreement states that "[i]f any court or arbitrator determines that the class-action waiver set forth in the preceding sentence is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration agreement set forth in these Dispute Resolution Terms shall be deemed null and void in its entirety and the parties shall be deemed to have not agreed to arbitrate Claims." Since the arbitration provision violates *McGill*, it is "null and void in its entirety" by its own terms.

Defendant may also argue on reply that the Court does not have the power to decide the *McGill* issue because that issue was purportedly delegated to the arbitrator. Not so. While challenges to the validity of the underlying contract are typically for the arbitrator to decide, "challenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance." *Ring*, 91 Cal. App. 5th at 1196-97. "This is because the usual presumption is that a court, not an arbitrator, decides threshold issues of arbitrability such as whether the arbitration agreement itself is valid and enforceable." *Id*. at 1197. Though parties may delegate authority to the arbitrator to decide such threshold issues, "given the contrary presumption, evidence that the parties intended such a delegation must be 'clear and unmistakable' before a court will enforce a delegation provision." *Id*. "This is a 'heightened standard,' higher than the evidentiary standard applicable to other matters of interpreting an arbitration agreement." *Id*.

Here, there is no clear and unmistakable delegation to the arbitrator because the agreement indicates that some questions must be decided by a court. "As a general matter, where one contractual provision indicates that the enforceability of an arbitration provision is to be decided by the arbitrator, but another provision indicates that [a] *court* might also find provisions in the contract unenforceable, there is no clear and unmistakable delegation of authority to the arbitrator." *Id*. (quoting *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 791-92 (2012)). "Even broad arbitration clauses that *expressly* delegate the enforceability decision to arbitrators may not meet the clear and unmistakable test, where other language in the agreement creates an uncertainty in that regard." *Id*.

Here, the arbitration provision contains a delegation provision, stating that an arbitrator shall decide issues of "arbitrability, validity, enforceability, or scope of the arbitration provision." However, another provision in the contract clearly implies that *a court* may determine such issues. Specifically, in Section 5, the agreement states that "[i]f any *court* or arbitrator determines that the class-action waiver set forth in the preceding sentence is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration agreement set forth in these Dispute Resolution Terms shall be deemed null and void in its entirety." This provision is exactly like the "poison pill" provision in Ring that the California Court of Appeals found to infuse ambiguity into

delegation. *See Ring*, 91 Cal. App. 5th at 1199-1200. "Thus, the arbitration provision points in two directions on the question whether a court or an arbitrator is to decide the enforceability of the agreement to arbitrate." *Id*. at 1199. *See also id*. at 1197-98 (citing cases with similar poison pill provisions and holdings). Accordingly, because there has been no "clear and unmistakable" delegation, the Court has the power to rule on the *McGill* issue.

**C. Safeway's arbitration clause is unconscionable.**

Defendant's arbitration clause is unconscionable, and should not be enforced for that additional reason. Under the FAA, an arbitration agreement is invalid when it is unenforceable under "generally applicable contract defenses" recognized by state law, such as "unconscionability." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). (internal quotation marks and citation omitted). "Under California law, plaintiffs seeking to invalidate a contractual provision as unconscionable must prove both procedural and substantive unconscionability." *In re BAM Trading Servs. Inc. Sec. Lit*., 733 F. Supp. 3d 854, 865 (N.D. Cal. 2024). However, "California courts employ a sliding scale to determine unconscionability, the more substantively oppressive the contract terms, the less evidence of procedural unconscionability is required to conclude the terms are unenforceable, and vice versa." *Id*. Procedural unconscionability "focus[es] on oppression or surprise due to unequal bargaining power" whereas substantive unconscionability focuses "on overly harsh or one-sided results." *Id*. To challenge a delegation provision on unconscionability grounds, "the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it," but the party can "use the same arguments to challenge both the delegation provision and arbitration agreement, so long as the party articulates why the argument invalidates each specific provision." *Id*. (quoting, 87 F.4th at 1011).

"Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co*., 733 F.3d 916, 922 (9th Cir. 2013). "Substantive unconscionability pertains to the fairness of an agreement's actual terms and to

assessments of whether they are overly harsh or one-sided." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012).

Here, it is difficult to imagine a more procedurally unconscionable arbitration agreement as a whole, including the delegation provision. The agreement here is beyond the pale of a "contract of adhesion," which by itself suggests some level of procedural unconscionability. *See In re BAM*, 733 F. Supp. 3d at 866. Typically, a contract of adhesion is presented to consumers or employees on a "take-it-or-leave-it basis" by a party with superior bargaining strength. *See id*. Here, consumers were not presented any meaningful opportunity to actually accept the agreement at all, such as by clicking a box, taking an action implying assent to some set of terms, or actually signing a contract. Instead, Defendant sent a mass email from a no-reply marketing account, did not require consumers to take any action, did not require that customers even view or open the email, did not require that customers click on the terms or acknowledge seeing them, did not do anything to ensure that the emails made it to primary inboxes instead of promotions or spam accounts, and did not do anything to verify if the customer email addresses it was using were valid or actually used or accessible by customers. Not a single Plaintiff was aware of the email, opened the email, or interacted with the email in any way. Some could not find it even after being asked by counsel to find it, as they no longer even have access to the email addresses used. There can be no bigger showing of "surprise" than where, as here, there is nothing in the record suggesting that any of the Plaintiffs were even aware of the putative arbitration agreement. *See Chavarria*, 733 F.3d at 922. And, because Plaintiffs had no constructive, implied, or actual knowledge of the agreement as a whole, they certainly had no such knowledge of the delegation provision, making it procedurally unconscionable.

Because California uses a sliding scale to unconscionability, and the procedural unconscionability is at a maximum imaginable level, even very slight substantive unconscionability should invalidate the agreement, including the delegation clause. Here, as in *Jiffy Lube Int'l, Inc., Text Spam Lit*., 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. Mar. 9, 2012), "[t]he language of the arbitration agreement is incredibly broad," and "is not limited to disputes arising from or related to the transaction or contract at issue." For instance, the arbitration agreement purports to include "tort" claims, "or any

other legal theory," between customers and Defendant. That would presumably include, for instance, a claim that one of Defendant's employees intentionally murdered a customer in the parking lot, or even in their home for skipping out on paying the bill at checkout 10 years prior. Such a broad provision is "clearly … unconscionable." *See id.*, 847 F. Supp. 2d at 1262-63. "For example, in *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003), Judge Posen noted that if there were no limiting clause in the arbitration agreement at issue in that case, 'absurd results [would] ensure,' such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated." *In re Jiffy Lube*, 847 F. Supp. 2d at 1263.

Further, as discussed above, the terms are substantively unconscionable because they waive unavailable rights under California law for public injunctive relief.

The arbitration clause contains other unconscionable provisions. It purports to require a plaintiff to "pay all costs incurred by a responding party, including any attorney fees, related to a Claim if an arbitrator determines that (i) the Claim was not warranted by existing law or by a nonfrivolous argument." It is well-established that "loser pays" provisions are substantively unconscionable because they put claimants at greater financial risk than they would face were they to litigate their claims in court. *See, e.g.*, *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1004 (9th Cir. 2010). Because the agreement purports to award fees where the plaintiff's claim was "not warranted by existing law," i.e., if the plaintiff simply loses on the merits, the plaintiff faces needing to "pay fees that could not be awarded in a judicial forum," where each side would pay its own fees. *See Morris v. Pac. Dental Servs., LLC*, 2023 WL 4826142, at *7 (D. Ariz. July 27, 2023); *Ajamian v. CantorCO2e*, 203 Cal. App. 4th at 797.

Separately, the arbitration provision is unconscionable because it gives the defendant a "free peek at the plaintiff's case, thereby obtaining an advantage" in later proceedings, while putting the plaintiff at significant financial risk if he or she opts not to offer this free peek. *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1287, 1283 (Cal. Ct. App. 2007). The arbitration clause requires a claimant to first "make a good-faith effort to negotiate for 45 days" before filing an arbitration, and purports to impose "costs and fees-including arbitration fees, attorney fees, and expert fees" on any

plaintiff who "breaches" that requirement. "While on its face, this provision may present a laudable mechanism for resolving [disputes] informally, it connotes a less benign goal." *Nyulassy*, 120 Cal. App. 4th at 1283. Requiring a plaintiff to give a defendant a "free peek" at his or her arguments before filing is further evidence of the agreement's substantive unconscionability. *See id. See also Bright v. Am. Home Shield Corp*., 2022 WL 1626714, at *5 (E.D. Cal. May 23, 2022) (finding presuit resolution process substantively unconscionable where it was unilateral and gave defendant a "free peek"); *Bankwitz v. Ecolab, Inc.*, 2017 WL 4642284, at *3 (N.D. Cal. Oct. 17, 2017) (noting that "a contractual requirement of pre-dispute resolution may add a degree of unconscionability").

In short, the entire arbitration agreement is permeated with both substantive and procedural unconscionability. It cannot and should not be enforced.

Defendant's only cited case suggesting that the arbitration agreement is not unconscionable because Plaintiffs purportedly received notice via email is *Babaeva v. J. Crew Grp., LLC* , 2023 WL 7346079, at *2 (N.D. Cal. Nov. 6, 2023). *See* Mot. at 17 (citing *Babaeva*). The decision in *Babaeva* spans a total of two pages, and is entirely unhelpful. There, the Plaintiff "[did] not contend that the arbitration provisions in the terms of use or the rewards program were procedurally or substantively unconscionable." *Babaeva*, 2023 WL 7346079, at *2. And, unlike here, the plaintiff there agreed to the terms when, "at the time of Plaintiff's online purchase, the checkout page conspicuously stated, 'By placing your order, you agree to our Terms of Use." *Id*. (internal quotations omitted). Defendant has not submitted anything in the record of what, if anything, Plaintiffs saw when they opened their accounts. The fact that the plaintiff in *Babaeva* also got some email updates was not central to the holding.

## V. CONCLUSION

Safeway has failed to carry its burden to show this case should be arbitrated. Plaintiffs request that the Court deny the motion to compel arbitration.

Dated: May 9, 2025

Respectfully submitted,

*/s/ Katherine M. Aizpuru*
Katherine M. Aizpuru (*pro hac vice*)
Allison W. Parr (*pro hac vice* to be filed)

**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
kaizpuru@tzlegal.com
aparr@tzlegal.com

Annick M. Persinger (CA Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway – Suite 1070
Oakland, CA 94612
P: 510-254-6808
F: 202-973-0950
apersinger@tzlegal.com

Neal J. Deckant (State Bar No. 322946)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com

Yeremey O. Krivoshey (Bar No. 295032)
**SMITH KRIVOSHEY, PC**
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
yeremey@skclassactions.com

Joel D. Smith (Bar No. 244902)
**SMITH KRIVOSHEY, PC**
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
joel@skclassactions.com

*Attorneys for Plaintiffs and the Putative Class*