UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TEMPEST, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAFEWAY, INC.,<br><br>    Defendant. | Case No. 24-cv-06553-JSC<br><br>**ORDER RE: MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 33 |

Plaintiffs, members of Safeway, Inc.'s rewards program, seek to represent a class of Safeway Rewards members who purchased wine advertised at a members-only price. (Dkt. No. 30-1 ¶ 83.) Plaintiffs allege Safeway "deceives its customers by offering false discounts on its wine prices when, in fact, Safeway's sale prices are not temporary at all but are instead Safeway's price of the wine that is always available to every consumer as part of its free [rewards] program available at checkout." (Dkt. No. 30-1 ¶ 29.) Now pending before the Court is Safeway's motion to compel arbitration. Having carefully considered the parties' submissions, and with the benefit of oral argument on July 3, 2025, the Court DENIES Safeway's motion to compel arbitration. On the record before the Court, no reasonable trier of fact could find Plaintiffs formed an agreement to arbitrate with Safeway.

**BACKGROUND**

**I.     COMPLAINT ALLEGATIONS**

Plaintiffs Michael Tempest, LaDiamond Harvey, Sarah McGregor Horner, Brionna Brouhard, Kerry McCarty, Hillary Beam, and Christopher Lundt are residents of California, Oregon, and the District of Columbia. (*Id.* ¶¶ 8-14.) All are members of Safeway's "free membership rewards program for customers, Safeway Rewards," also referred to as "Safeway for

U." (*Id.* ¶ 19.) "Members are eligible to receive purported price discounts on products available for purchases in-store as long as they use their account number at checkout." (*Id.* ¶ 21.)

Plaintiffs purchased wine that "was advertised as marked down from a reference price, as a time-limited discount promotion for Safeway Rewards members." (*Id.* ¶ 45.) Plaintiffs believed they were "buying wine at a temporary discounted sale price and had therefore saved money on the purchase by making it during the time-period for the sale that Safeway consistently included in its shelf advertising." (*Id.* ¶ 46.) In fact, Plaintiffs were "not actually buying wine at lower prices than ordinarily offered—as the wine is always offered at the discount price to all consumers (who can become members at check out for free)." (*Id.* ¶ 34.)

## II. PROCEDURAL HISTORY

Plaintiffs filed suit in September 2024. (Dkt. No. 1.) In November 2024, Safeway moved to compel arbitration. (Dkt. No. 20.) The Court granted the parties' stipulation permitting Plaintiffs to file an amended complaint, (Dkt. No. 26), which Plaintiffs did. (Dkt. No. 27.) Plaintiffs subsequently filed the operative second amended complaint ("SAC"). (Dkt. No. 30.) They bring claims on behalf of a putative nationwide class and California, Oregon, and D.C. subclasses alleging violations of (1) California False Advertising Law, (2) California Unfair Competition Law, (3) California Consumer Legal Remedies Act, (4) Oregon Unlawful Trade Practices Act, and (5) District of Columbia Consumer Protection Procedures Act. (*Id.* at 26-38.) Plaintiffs also allege breach of contract, unjust enrichment, and fraud. (*Id.* at 31-34.)

In April 2025, Safeway moved to dismiss the SAC and to compel arbitration. (Dkt. Nos. 32, 33.)

## III. RELEVANT FACTS RE: TERMS OF USE

"In May 2024, all Safeway for U members were sent an e-mail notifying them that the applicable Terms of Use had been updated as of May 6, 2024." (Dkt. No. 33-1 ¶ 3.) The email's subject line read "We've Updated our Terms of Use." (Dkt. No. 33-4 at 2.) The body of the email included the following language: "Our Terms of Use contain important information about your relationship with us, including that disputes between us will be arbitrated, instead of class actions of jury trials." (*Id.*) As pictured below, the email contained a link to "View Terms of Use":

2

> From: Safeway <no-reply@offers.safeway.com>
> Sent: Monday, May 6, 2024 6:01 PM
> To: albertsons.emailteam
> Subject: PROOFS: corp-priv_termsandconditions – op – 19 : We've Updated Our Terms of Use
>
> **SAFEWAY**
>
> At Albertsons Companies, we're committed to the best possible experience for our customers.
>
> That's why we're letting you know that we have updated our Terms of Use. These terms apply to new customers immediately and are effective from May 6, 2024 for our continuing customers. Our Terms of Use contain important information about your relationship with us, including that disputes between us will be arbitrated, instead of class actions or jury trials.
>
> We encourage you to regularly review our Terms of Use.
>
> [View Terms of Use]
>
> Shop    Safeway for U    Sign In

(*Id.*)

Greg Borup—the Director of Customer & Merchandising Insights at Albertson's Companies, Inc., a parent company of Safeway—reviewed Albertson's business records. (Dkt. No. 33-1 ¶¶ 1-2.) He attests the email described above "was successfully delivered to the email address . . . associated with an account belonging to Michael Tempest, on May 9, 2024. There was no error with transmission of the Email to the subject email address." (*Id.* ¶ 4.) Mr. Borup submits the same attestation for the other plaintiffs, stating the email was successfully delivered to Ms. Harvey, Ms. McGregor Horner, Ms. Brouhard, Ms. McCarty, Ms. Beam, and Mr. Lundt between May 7 and May 9, 2024. (*Id.* ¶¶ 5-10.)

"By clicking anywhere within the hyperlink box, the user is automatically directed to the Terms of Use," which begin in bold font with notice of the arbitration provision:

> ATTENTION: THESE TERMS OF USE CONTAIN A MANDATORY ARBITRATION PROVISION THAT, AS FURTHER ADDRESSED IN **SECTION 24** BELOW AND OUR **DISPUTE RESOLUTION TERMS** REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES. THIS MEANS THAT YOU AND THE COMPANY (AS DEFINED BELOW) ARE EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT OR IN CLASS ACTIONS OF ANY KIND. IN ARBITRATION, THERE IS NO JUDGE OR JURY.

((Dkt. No. 33-2 ¶ 11; Dkt. No. 33-3 at 2.) Section 24, in turn, states "all claims arising from or

related to your account, access to or use of the company's services, [and] purchases from the company" are subject to dispute resolution terms that "contain procedures that apply to mass arbitration" "unless you opt out or another section applies." (*Id.* at 10.) The terms proceed to describe the opt-out process. Customers can opt out of the arbitration provision "within 30 days of their first purchase from the Company after the date of the Terms of Use (that date being May 6, 2024)" by going to a specified link or sending written notice. (Dkt. No. 33-2 ¶¶ 18-19.)

Kevin Michael, the Director of Loyalty & Division Support at Albertson's, submitted a declaration stating none of the plaintiffs opted out of the arbitration provision within the time period provided. (*Id.* ¶¶ 1, 21.) "The first time Mr. Tempest made a purchase after the May 2024 Update was May 9, 2024." (*Id.* ¶ 24.) The first purchases for Ms. Harvey, Ms. McGregor Horner, Ms. Brouhard, Ms. McCarty, Ms. Beam, and Mr. Lundt were between May 7 and May 12, 2024. (*Id.* ¶¶ 25-30.) No plaintiff opted out by their respective deadlines of June 6 through June 11, 2024. (*Id.* ¶¶ 24-30.)

Plaintiffs attest they were "made aware through Safeway's November 12, 2024 motion to compel arbitration of Safeway's May 6, 2024 email and that Safeway had changed its terms and conditions." (Dkt. No. 40-1 ¶ 4.) At the direction of their counsel, Plaintiffs searched their email inboxes. Three of them found the email from Safeway. (Dkt. No. 40-2 ¶ 9 (Ms. Harvey found the email in her "promotions inbox"); Dkt. No. 40-3 ¶ 9 (Ms. McGregor Horner found the email in her "junk folder"); Dkt. No. 40-7 ¶ 10 (Mr. Lundt "found an email from Safeway").) Mr. Tempest, Ms. Brouhard, and Ms. McCarty were "not able to find any emails from Safeway or Albertsons from May 2024 regarding the terms and conditions for the Safeway for U rewards membership." (Dkt. No. 40-1 ¶ 9; Dkt. No. 40-4 ¶ 9; Dkt. No. 40-5 ¶ 9.) Ms. Beam "ha[s] not used the email address associated with [her] Safeway for U account in at least 10 years" and "do[es] not have the password for that email address anymore." (Dkt. No. 40-6 ¶¶ 8-9.)

On November 15, 2024, Plaintiffs sent letters opting out of arbitration.[1] (Dkt. Nos. 40-1 ¶ 7; 40-2 ¶ 7; 40-3 ¶ 7; 40-4 ¶ 7; 40-5 ¶ 7; 40-6 ¶ 7.)

---

[1] Mr. Lundt, first named as a plaintiff in the SAC, opted out of arbitration on February 11, 2025. (Dkt. No. 40-7 ¶ 7.)

1    Although Plaintiffs became Safeway Rewards members between 2009 and 2021 (Dkt. Nos. 40-1 ¶ 2; 40-2 ¶ 2; 40-3 ¶ 2; 40-4 ¶ 2; 40-5 ¶ 2; 40-6 ¶ 2; 40-7 ¶ 2), the record does not contain any evidence as to what, if anything, each plaintiff agreed to during the sign-up process.  Safeway submitted its terms of use as of May 6, 2024, in which Safeway "reserve[s] the right to make changes to these Terms at any time, and such changes will be effective immediately upon being posted on the Sites. . . . Your continued access to or use of your Account or the Services constitutes your acceptance of the current Terms."  (Dkt. No. 33-3 at 3.)  But Safeway provides no evidence as to its terms in 2009, 2010, 2012, 2013, and 2021—the years Plaintiffs became Safeway Rewards members.  In its reply in support of its motion to compel, Safeway cites a District of Arizona case in which Safeway's November 2022 terms of use—provided as an exhibit in that case—contained similar language regarding modification.  *Ehrmantraut v. Safeway Inc.*, 732 F. Supp. 3d 1030, 1034 (D. Ariz. 2024).  Even were the Court permitted to judicially notice the November 2022 terms provided as evidence in *Ehrmantraut*, those terms postdate Plaintiffs becoming Rewards members.  The record also does not include any evidence Safeway ever emailed any plaintiff on any occasion, other than the single occasion at issue on Safeway's motion to compel.

**DISCUSSION**

The Federal Arbitration Act (FAA) governs arbitration agreements "evidencing a transaction involving commerce."  9 U.S.C. § 2.  Such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.*  In resolving a motion to compel arbitration under the FAA, a court's inquiry is limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quotation marks omitted).  "If both conditions are met, the FAA requires the court to enforce the arbitration agreement in accordance with its terms."  *Id.* (cleaned up).

Plaintiffs do not dispute Safeway's assertion the FAA governs their agreement.  Regarding the second gateway issue, Plaintiffs do not challenge Safeway's assertion the agreement

5

encompasses the dispute at issue. The parties' disagreement pertains to the first gateway issue: whether a valid agreement to arbitrate exists. Safeway argues "Plaintiffs all received the Email notifying them of the terms" and afterwards, "continued to make purchases in which they sought and received the benefits of their loyalty accounts, thereby manifesting assent to the Terms." (Dkt. No. 33 at 19.) Plaintiffs respond "Safeway's one-way email notice did not create an enforceable contract requiring arbitration." (Dkt. No. 40 at 11.)

## I.    EXISTENCE OF AGREEMENT

The existence of an arbitration agreement is a question for the Court, not an arbitrator. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also Reichert v. Rapid Invs., Inc.*, 826 F. App'x 656, 658 (9th Cir. 2020) ("Notwithstanding any delegation clause in the Agreement, challenges to the existence of a contract as a whole must be determined by the court prior to ordering arbitration.") (cleaned up). As the party seeking to compel arbitration, Safeway bears the burden of proving the existence of an agreement. *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). When, as here, "the making of the arbitration agreement" is at issue, the summary judgment standard applies. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting 9 U.S.C. § 4). To prevail under the summary judgment standard, Safeway must show there is no genuine issue as to any material fact regarding formation of the arbitration contract. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Conversely, to deny the motion to compel arbitration, rather than hold a trial on arbitration agreement formation, the Court must find no reasonable trier of fact could find an agreement was made. *Hansen*, 1 F.4th at 670 ("once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved"). In evaluating the record, the Court must "give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023).

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Patrick v. Running Warehouse, LLC*, 93

6

1   F.4th 468, 476 (9th Cir. 2024). Under California law, "the vital elements of a cause of action

2   based on contract are mutual assent (usually accomplished through the medium of an offer and

3   acceptance) and consideration."[2] *Aton Ctr., Inc. v. United Healthcare Ins. Co*., 93 Cal. App. 5th

4   1214, 1231 (2023) (cleaned up). To put it another way, "there must be actual or constructive

5   notice" of the contract offer "and the parties must manifest mutual assent." *Oberstein*, 60 F.4th at

6   512–13. The Court begins with whether Plaintiffs had notice of the arbitration offer, then turns to

7   manifestation of mutual assent.

### A.   Notice of Safeway's Arbitration Offer

#### 1.   Actual Notice

The record is undisputed Plaintiffs lacked actual notice, that is, knowledge, of the existence of Safeway's offer to enter into an arbitration agreement. Each plaintiff attests they were "made aware through Safeway's November 12, 2024 motion to compel arbitration of Safeway's May 6, 2024 email and that Safeway had changed its terms and conditions." (Dkt. Nos. 40-1 ¶ 5; 40-2 ¶ 5; 40-3 ¶ 5; 40-4 ¶ 5.) As Safeway does not identify any evidence that disputes each plaintiff lacked actual notice, it is undisputed no plaintiff had actual notice of Safeway's email offer. All the record establishes is that Safeway emailed the offers to each plaintiff and no plaintiff read the email offer prior to their respective first Safeway purchase after May 6, 2024.

#### 2.   Constructive Notice

So, the next question is whether Plaintiffs had constructive notice, that is constructive knowledge, of Safeway's arbitration offer before their first Safeway purchase after May 6, 2024. Safeway does not cite, and this Court is not aware, of any case holding that a consumer has constructive notice of an arbitration offer based solely on an email of which the consumer is unaware.

The cases upon which Safeway relies are very different from the undisputed facts here. For the most part they involve "clickwrap" and "browsewrap" agreements on websites. "Clickwrap" refers to an agreement where "a website presents users with specified contractual

---

[2] The parties do not argue the application of Oregon or D.C. law affects the result, so the Court focuses it analysis on California law.

7

terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Oberstein*, 60 F.4th at 513.  "Browsewrap" refers to an agreement where "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.*  In the browsewrap and clickwrap context, courts consider whether "the website provide[d] reasonably conspicuous notice of the terms to which the consumer will be bound" by scrutinizing factors such as the notice's font size, font color, and the visibility of hyperlinks. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-57 (9th Cir. 2022).  When a website is found to provide reasonably conspicuous notice of its terms and conditions, the plaintiffs are charged with inquiry notice of those terms—regardless of whether the plaintiffs themselves saw them—because "the court can fairly assume that a reasonably prudent Internet user would have seen" them. *Id.*

But here, in contrast, Plaintiffs were not visiting a website and so cannot be charged with constructive notice of a website's content.  Since the record is undisputed Plaintiffs never saw the May 2024 email Safeway relies on for notice purposes, it matters not whether the email's font was size 6 or size 24, whether the hyperlinks were blue or grey, or whether the body of the email was one or ten paragraphs long.  The clickwrap and browsewrap cases are wholly inapposite.

Safeway insists courts "have consistently enforced online agreements sent forth via email." (Dkt. No. 33 at 19.)  But in none of those district court cases did the plaintiff present evidence they had no knowledge of the email containing the arbitration offer.  *See Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 933 (N.D. Cal. 2024) (noting the plaintiff "does not contend that he did not receive the email" and did "not submit[] any counter evidence that he did not receive the email updates"); *Sadlock v. Walt Disney Co.*, No. 22-CV-09155-EMC, 2023 WL 4869245, at *13 (N.D. Cal. July 31, 2023) (noting the plaintiff "has not contended he did not receive or see the emails in question"); *In re Uber Techs., Inc.*, No. 18-cv-3169-PSG (GJSx), 2019 WL 6317770, at *4 (C.D. Cal. Aug. 19, 2019) ("Plaintiff does not refute that she received such an email, nor that she continued to use the App after receiving the email."); *West v. Uber Techs.*, No. 18-CV-3001-PSG-GJS, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (noting the plaintiff's opposition does not address the fact he "continued using the App and [the defendant's] services for a year after

8

receiving that email"); *Babaeva v. J. Crew Grp., LLC*, No. 23-CV-01695-JSW, 2023 WL 7346079, at *2 (N.D. Cal. Nov. 6, 2023) ("*Having received emails*, including one entitled 'Important updates to our Terms & Conditions,' Plaintiff was bound by the agreement to arbitrate claims related to her purchases under the rewards program.") (emphasis added). Indeed, the *Sadlock* court explicitly stated it was not deciding whether email notice is sufficient when, as here, the plaintiffs testify they had no knowledge of the email's existence:

> [T]he Court's ruling here is based on the facts and arguments presented before it. The Court is not opining that, in any instance in which a defendant sends an email giving notice of updated terms and a plaintiff continues to use the defendant's service, the inquiry notice test has been satisfied. Indeed, the Court can see potential problems with a defendant relying on notice via email (problems aside from whether the email gave reasonably conspicuous notice of the terms of use). For example, was the email in fact received, or was the email shunted into a spam folder? Is there evidence that the plaintiff actually saw the email?

2023 WL 4869245, at *13.

The Court's conclusion that receipt of an email offer is required to form a contract is consistent with Ninth Circuit precedent. In *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1100 (9th Cir. 2023), in considering whether an email notifying users of new terms of service provided notice, the court noted the defendant "did not produce a copy of the 2019 email notifying drivers of the new [terms of service], nor did it provide any evidence that [the plaintiff] *received such an email*." *Id.* at 1096 (emphasis added). The defendant "provided only a declaration with a vague statement that a notice of updated terms was sent via email." *Id.* at 1100. "Given [the defendant's] limited proffer," the court "could not evaluate whether the email (assuming it was received at all) sufficed to provide individualized notice." *Id.* at 1100. The Ninth Circuit's focus on receipt of the email suggests that when a defendant updates its terms of service via email, as Safeway did here, whether the consumer actually receives the email, that is, is aware of the email, is relevant for notice purposes. Further, in *Jackson,* the record contained evidence of the original terms the plaintiffs had agreed to, which stated they were "responsible for reviewing this Agreement regularly to stay informed of any modifications." *Id.* at 1095. Again, here, Safeway offers no evidence as to how Plaintiffs signed up for Safeway Rewards, including evidence as to

9

what were the terms of use, if any, they agreed to at that time, let alone evidence Plaintiffs agreed Safeway could update its terms of use at any time.³ So, Safeway's evidence the emails were "successfully delivered" does not meet its burden to show contract formation or even create a genuine dispute as to contract formation.

Safeway also argues Plaintiffs' ongoing relationship with Safeway somehow establishes constructive notice of Safeway's offer. According to Safeway, that Plaintiffs have shopped at Safeway for years means Plaintiffs had notice Safeway could change its terms via email and so Plaintiffs are bound by emails Safeway sent containing new terms. But, again, Safeway does not offer any evidence of the terms of use, if any, Plaintiffs agreed to when they signed up for Safeway Rewards; so, there is no evidence Plaintiff had notice Safeway could change its terms via email. And, there is no evidence Safeway ever sent any plaintiff any email other than the May 6, 2024 email. Safeway's reliance on *Oberstein* is misplaced. *Oberstein* involved a website agreement in which "users [were] presented with a confirmation button above which text inform[ed] the user that, by clicking on this button, 'you agree to our Terms of Use.'" *Id.* at 515. The Ninth Circuit "agree[d] with the district court that a reasonable user would have seen the notice and been able to locate the Terms via hyperlink." *Id.* at 516. Regarding the context of the transaction, the court distinguished a California Court of Appeal case in which the plaintiffs "were merely attempting to start a free trial, making it less likely that they would 'scrutin[ize] the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms.'" *Id.* (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480 (2021)). In *Oberstein*, because the transaction "requir[ed] a full registration process," the court concluded it "reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517.

In *Oberstein* and *Sellers*, the context of the transaction informed how closely users were expected to scrutinize website agreements. *See Sellers*, 73 Cal. App. 5th at 476 ("[I]t is

---

³ At oral argument, Safeway repeatedly lamented that Plaintiffs had not offered any evidence as to the terms of their original participation in the Safeway Rewards program. But Safeway, as the party moving to compel arbitration, bears the sole burden of proving the existence of an agreement to arbitrate.

10

1  questionable whether a consumer buying a single pair of socks, or signing up for a free trial,
2  would expect to be bound by contractual terms, and a consumer that does not expect to be bound
3  by contractual terms is less likely to be looking for them.").)  The cases were about the moment
4  when the plaintiff formed the agreement on a website.  Neither case said a plaintiff who enters an
5  ongoing relationship must remain on the lookout for new agreements governing that relationship,
6  especially when the counterparty has not advised the plaintiff to be on the lookout.  Nor did
7  *Oberstein* or *Sellers* say that when an ongoing relationship exists, a plaintiff is on perpetual notice
8  to look out for new agreement offers—regardless of the form of those offers.

9      Moreover, in "considering the context of the transaction" here, *see Oberstein*, 60 F.4th at
10  516 (cleaned up), it is relevant that most of the plaintiffs signed up to become Safeway Rewards
11  members in person at Safeway stores, (Dkt. Nos. 40-1 ¶ 2; 40-2 ¶ 2; 40-3 ¶ 2; 40-4 ¶ 2; 40-5 ¶ 2;
12  40-6 ¶ 2), whereas notice of the arbitration offer was provided via email.  The discrepancy
13  between in-person sign-up and email notice further undermines Safeway's argument that an "out
14  of the blue" email created sufficient notice in this case.

15      \*\*\*

16      So, Safeway has not met its burden of establishing actual or constructive notice of its offer
17  or its terms as a matter of law.  Further, drawing all reasonable inferences from the evidence in
18  Safeway's favor, no reasonable trier of fact could find Plaintiffs had actual or constructive notice
19  of Safeway's email offer or its terms.

20      **B.**    **Manifestation of Assent**

21      "Mutual assent requires, at a minimum, that the party relying on the contractual provision
22  establish that the other party had notice and gave some indication of assent to the contract."
23  *Jackson*, 65 F.4th at 1099.  "Parties traditionally manifest assent by written or spoken word, but
24  they can also do so through conduct." *Berman*, 30 F.4th at 855.  "The conduct of a party is not
25  effective as a manifestation of his assent unless he intends to engage in the conduct and knows or
26  has reason to know that the other party may infer from his conduct that he assents."  *Id.* (cleaned
27  up).

28      Safeway argues that by "continuing to shop at Safeway after receiving" the May 2024

notice, Plaintiffs "manifested repeated assent to the terms." (Dkt. No. 33 at 19.) But it is undisputed no plaintiff had knowledge of Safeway's email offer, and Safeway has not established Plaintiffs can be charged with inquiry notice of the contents of an email   Because Safeway has not established the email provided notice of the arbitration offer, it follows that no reasonable trier of fact could find Plaintiffs' subsequent purchases at Safeway manifested assent to Safeway's offer. Put another way, given it is undisputed Plaintiffs did not know Safeway made an offer, the Court cannot conclude as a matter of law Plaintiffs' conduct constituted acceptance of that offer or that there is even a genuine dispute on that issue. *See Knutson,* 771 F.3d at 569 (the plaintiff "could not assent to [the defendant's] arbitration provision because he did not know that he was entering into a contract with [the defendant]").

**CONCLUSION**

As on the record before the Court no reasonable trier of fact could find Plaintiffs made an arbitration agreement with Safeway, the Court DENIES Safeway's motion to compel arbitration.[4] The Court postpones setting a hearing on Safeway's motion to dismiss until after Safeway determines whether it will appeal this order denying the motion to compel arbitration. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) ("[A] district court must stay its proceedings while the interlocutory appeal on arbitrability is ongoing.").

This Order disposes of Docket No. 33.

**IT IS SO ORDERED.**

Dated: July 16, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge

---

[4] Having determined no reasonable trier of fact could find Plaintiffs formed an agreement to arbitrate with Safeway, the Court need not address Plaintiffs' arguments that the arbitration clause is unenforceable and unconscionable.